2-0-1-0-4-0-7 Navistar, a.k.a. International Trumpet Engine, v. Patterson Counsel, please Good afternoon, Your Honors. Rick Kimnock on behalf of Navistar Council. May it please the Court. There are two cases before the Court that arise by virtue of one circuit court order confirming two decisions by the Workers' Compensation Commission. I want to focus on the second of the two accidents where the Commission determined that the petitioner, as a result of cervical injuries, was permanently and totally disabled. Now, I would ask the Court to assume arguendo, although I have big issues, assume arguendo that the cervical injuries were indeed a consequence, in whole or in part, of the accident of October 5, 1994. Even with that assumption, the Commission's determination that the petitioner is permanently and totally disabled, I submit, is contrary to the law, clearly erroneous, and against the manifest weight of the evidence. That decision is predicated only upon the opinions of Dr. Jeffrey Coe. I know Dr. Coe. I'm not here to dish Dr. Coe. In fact, I would count him as a friend. But he overreached in this case with regard to permanent total disability. He didn't overreach as much as the petitioner would want you to think, though. His opinion was that the petitioner was, and I'm quoting, unable to carry out gainful employment in any type of competitive labor marketplace on a regular basis. And that was because, only because, the petitioner said he couldn't work on a sustained basis 40 hours a week. There's no objective substantiation of that. But even if you assume that that's a valid recitation by the petitioner and a valid incorporation by Dr. Coe, that does not equal physical, permanent, total disability. It instead resonates with an odd lot permanent total disability. An odd lot permanent total is described as one who, though not altogether incapacitated to work, is so handicapped that he will not be employed regularly in any well-known branch of the labor market. And that's cited in the Alano v. Industrial Commission decision. A permanent total disability from a medical or physical standpoint, we cite Larson in our brief, but if you look at the cases that actually talk about physical disability as opposed to odd lot disability, they do come close to describing what it is. It's either unable to do any work, which was the opinions in Seco Corporation, or totally disabled to do any work, or incapable of obtaining employment without seriously endangering his health or his life. Nothing from Dr. Coe's testimony said that if the petitioner were to reenter the workplace, he would be seriously endangering his health or his life by performing some type of remunerative labor. Wait a minute. Hold on. Let's not get odd lot confused with medical. If a person is injured to the extent that they cannot work, that's medical. Odd lot is proved up by showing, number one, a diligent but unsuccessful job search, or by showing that in light of his age experience, training and education, he's unable to perform any task for which there is a labor market. Now, the question that I have is, is a medical doctor competent to give such an opinion? Dr. Coe certainly isn't, and this court so said in Weston Hotel. Now, there might be a doctor who is such a polymath that he knows all about vocational rehabilitation and everything, but Dr. Coe doesn't qualify for that, and there was no vocational testimony from some other expert in the vocational field proffered by the petitioner. The petitioner himself, he did look for work once upon a time, but not after he had his cervical surgery. So we have no diligent but fruitless job search. We have no vocational testimony. We have Dr. Coe who qualifies his opinions based upon factors that resonate with odd lot, not medical permanent toll, and Dr. Coe himself personally has been identified as being incompetent to testify as to the vocational ramifications of physical disabilities, and that's in the Weston Hotel case. What about the testimony of the claimant? Isn't that relevant here as to what he can and can't do? Relevant? The back locks up. He can't move. I mean, is that in the mix at all or not? Is it relevant? It's relevant. It would be a factor for a vocational expert to take into account. To an extent, it would be a factor for Dr. Coe to take into account, but standing by itself, it's not competent to determine whether or not he is capable of returning to some sort of competitive remunerative employment. So you're saying there's no evidence in the record to support the commission's decision that he's permanently totally disabled? That's your position? I'm saying that the evidence is insufficient for an odd lot permanent total. It's insufficient for a medical permanent total, and nobody said he's obviously totally disabled. And, of course, he doesn't meet a statutory permanent total. He's lost the use of two members. So he's not permanently totally disabled, or at least he failed to prove that. By the way, you ask about the petitioner's articulation of his current problems and stuff. One factor that has to be taken into account in this case is the petitioner, by the commission's own assessment, was not credible. So how do you place any value on what he's saying independent of some type of medical corroboration? You just can't do it. Now, up to this point, I've asked you to assume that the cervical problems are legitimate, and I don't think anyone says the guy didn't have a bad neck. I've also asked you to assume that they're causally related to his accident. That is much more problematic. Now, I understand the burden that I have here. I have to convince this court that no rational trier of fact would determine that the petitioner's cervical problems are causally related to his October 5, 1994 accident. Tough burden. However, if you look at Dr. Koh's opinion, and you look at the basis of that opinion, and then you look at the facts surrounding that opinion, you come to a point where you go, this doesn't make sense. The date of accident is October 5, 1994. At that time, the petitioner felt a pop in his left elbow. His only complaints were to his left elbow and his left hand, or distal from the elbow to the left hand. No neck complaints. No neck complaints the next week or the week after that or the week after that. October 26, 1994, he presents to the clinic with no neck complaints. The doctor palpates the neck, and lo and behold, palpation yields articulation, tenderness or whatever. In his neck. Well, that's not a surprise. The guy's had neck problems since an armored door fell on his head while he was in the Navy, or at least since 1979 when he had another accident unrelated to ours. He had prior work restrictions because of his neck problems. Surgery was contemplated before because of his neck problems. He had an MRI which showed degenerative conditions in the cervical spine, but at the levels that were not implicated relative to the ulnar nerve. The ulnar nerve emanates from C7 to T1. The pathology noted in the MRIs consistently was from C4 to C7. It never went any deeper. So there was no pathology identified at the supposedly implicated C7 T1. There was never any electrodiagnostic confirmation of a problem with C7 T1. There was never any surgical assessment of C7 T1 when he did have the surgery. The surgery itself did not address C7 T1. And the guy had left elbow problems before this accident. Lo and behold, he still has left elbow problems because it was not surgically addressed. Is there any importance to the determination that Navistar determined in 1998 that he was totally and firmly disabled for pension purposes? How does that fit in? I think I addressed that in my brief, but I don't think that has any importance because, number one, we don't know by what standard they characterize permanent total disability. Is it because he can't work at all or merely because they've got no spot for him? And even if they do say that he's permanently totally disabled, that begs the question, because of what? And Lord knows this guy's got a whole history of neck problems, back problems, arm problems. It doesn't speak to really this particular accident or the consequences of this particular accident. So the surgery was not therapeutic for this guy's problems. Why? Because it was to the neck, and his problems are in the left elbow and arm. The guy's condition, cervical condition, is not cause related to his accident. The manifest weight says that. I also raised in my brief, and if you follow me on the manifest weight question, you don't have to reach this, but with regard to even if you felt that this is a little close on the manifest weight question, with regard to the permanent total disability, this could come to the point where it's time for the court to adopt a clearly erroneous standard. Why would we do that? If you do not believe that Dr. Koh's opinion is not, and the commission's adaptation of that opinion, is not offensive to the law per se. If you believe that the commission's determination is not offensive to the manifest weight of the evidence, you still have to say, well, look, given the evidence of this guy's disability, does that amount to physical disability that the law demands, absent an odd-block permanent total? And that, I submit, is a mixed question of law and fact. The fact question is, how disabled is this guy? And the law question is, does that meet the threshold of physical disability? And I believe that under that standard, and I think under manifest weight, the petition's claim fails, but even if it were to survive manifest weight, it does not survive the clearly erroneous standard. And I submit it's contrary to the law. Because if we give the petitioner everything, his physical complaints, Dr. Koh's opinions, even if you add all those opinions up, they by themselves, undiluted by any skepticism, do not add up to a permanent total disability, so it's contrary to the law. Thank you. Thank you. Counsel, please. Thank you. May it please the Court. Counsel. My name is Gregory Tewitt. I represent Mr. Mabus in this case. I think briefly, basically, we have two questions here. One was a causal relationship opinion against the manifest weight of the evidence, and was defining a permanent total disability against the manifest weight of the evidence. Counsel, in his brief and here in his argument, has also tried to bring a new standard into workers' compensation by bringing in this clearly erroneous standard. And in there briefly cited one case, the City of Belvedere v. Illinois Labor Relations Board, and that's a labor case. It's not a workers' compensation case. So I think we would be bringing in a whole new standard and developing a whole new area of law if we were to bring this type of clearly erroneous standard into workers' compensation. The City of Belvedere case basically involved a labor relations question. There was some pension questions. There was interpretation of a contract. And that's not what we're dealing here. We're just dealing with, we know what the law is in regard to causal relationship. We know what the law is in regard to permanent total disability. The question is, were the factual findings of the arbitrator and then the commission and then the circuit court beyond that, were those decisions against the manifest weight of the evidence? So I don't think we should bring in a new area of law into workers' compensation. Dealing with the first issue, although he dealt with permanent total first, causal relationship. The arbitrator, if you read the arbitrator's decision, it's very lengthy. It's very detailed. It goes through a number of different factual things that were brought before the commission. And he detailed specifically why he felt there was a causal relationship. And as we know, with a manifest weight standard, basically, you know, no rational prior fact can look at the facts that are presented and come to the same conclusion that the commission did. Well, here, I think there are plenty of factors that we can look at that support the commission's decision, that a rational prior fact would look at and say, yes, the commission's decision was right. The first thing that the arbitrator looked at was the fact that after that first injury involving the back, that's not before this court, the man returned to work after a lengthy period of time off work. And he worked doing very heavy labor for a couple of years. And while he was working, he had no complaints involving his neck. He had no medical treatment involving his neck. He did go in a couple of times about his lower back. But nothing during that period just before the injury did he complain about his back. So that was one factor. The second factor was that when he did have this incident, and there's no dispute that he did have an injury on the job, that immediately he started complaining about radiating arm pain. Now, counsel talks about that it's elbow. Well, the nerve goes down from the neck into the arm and into the hand. And he made these complaints immediately after the accident. Also, an MRI was done on October 28th of the neck. So obviously within a short period of time after the accident, the doctors were concerned that this was a neck problem, that it was a cervical problem. And they did an MRI of the neck, not of the elbow, but of the neck. What did they find? There was bulging discs. There were herniated discs. There was pathology involving the neck. So all of these factors, along with Dr. Koh's opinion, were the reasons that the judge found causal relationship between them. Contrast to the first case, yes, he didn't find that Dr. Koh's opinion credible in the first case, and there were reasons for that. But in the second case, he looked at all the evidence, immediate complaints, mentions of the injury. He also went in and filled out a company disability report within about two weeks after the accident. And in that, he reported that he had problems in his arm, and he also had problems in his neck. So it was all these factors together that supported his causal relationship opinion. And I think a rational trier would see those factors, read the chronology, read the medical reports, and read Dr. Koh's opinion and find causal relationship. And therefore, it meets the manifest weight standard. In regard to permanent total disability, in our brief, we cited a number of cases, and counsel basically has been arguing the vocational factors, and that Dr. Koh is not capable of rendering a vocational opinion. I would agree with that. He's a medical doctor. He's capable of rendering medical opinions, and included in those opinions is an opinion as to a person's ability to perform gainful employment. That's what doctors do. They see people. They examine them. They treat them. They put restrictions on them. They may say the person can't do any work whatsoever. It happens all the time. If this case was an odd lot situation where we said, well, yeah, he could work. Maybe he could lift five pounds. Maybe he could bend. You know, maybe if he sit and stood all day, that person could work. But that's not the situation here. We have proved, and the commission adopted, and the arbitrator found, that this person was medically totally disabled from work. How do we know that? Because the arbitrator used Dr. Koh's examination as the date of disability. We also know that because there's no language within the decision of the arbitrator or the commission of burden shifting. So when you deal with an odd lot situation, the burden is on the petitioner to prove that there's an impairment, that it affects their ability to work, that they've made a job search, or they bring in vocational evidence to show the person has difficulty working. That burden then shifts over time. What was Koh's opinion? He said that he was incapable of work. He felt that he was totally disabled. Did he say he was incapable of work, or did he say he was unable to perform gainful employment of any type in a competitive labor market? I don't think he – well, he did use that. And then he also later – You got it there? I don't have it right in front of me, Judge. I've got a transcript there. He also, under cross-examination, when asked about the same issue, he said, look, I don't think this individual, because of his condition, because he has to take medications, because of the pain that he's having, I don't think the man could work a 40-hour work week. Well, that's a little different than saying he's a permanent total. Right. Because a person can't work a 40-hour work week, it doesn't make them a permanent total. True. So I'm trying to figure out whether Dr. Koh is rendering medical opinion or he's rendering vocational opinions. I think he's – I think he's rendering – Did he ever turn around and say that it is medically dangerous for this man to work? No. No, he didn't say that. No, he wasn't asked that question. Well, who's burden was it to ask it? Well, I don't think you have to prove that it's medically dangerous. I think that – Well, you have to prove it. Well, looking at the Max Shepard case, which I think you wrote the opinion on. I think I did, too. And it was a medical permanent total. And here were the factors that the court looked at. Taking into account the claimant's injury, the nature of the injury itself, his age, his education, his work history, and the opinions of the treating physician, we believe there's sufficient evidence in the record to support a conclusion that the claimant is incapable of performing services for which a stable mark exists. That's odd lot. No, that was not an odd lot decision, Judge. That's odd lot language. But it wasn't – It is odd lot language. There's in the decision – Medical opinion, if you take a look at E.R. Moore, says that he is not capable of gainful employment without serious risk to his health or life. That's a medical opinion, a permanent total. Right. Odd lot is, look, you've got a guy that has these injuries. He has a limited education. He has this deficiency, that deficiency, the other deficiency. There is no spot for him in a stable labor market. Now, he can do that with an expert opinion, or he can do that by coming up with job searches. In this particular case, he didn't have a job search. We don't have a vocational rehabilitation expert, and Dr. Koh never testified that he couldn't work without serious risk to his health or life. So now the question becomes, and this is what your opponent is harping on, is there any evidence in this record to support a permanent total? Okay. First, again, the case, the Max Shepard case, there was no vocational evidence presented in that case. It was a medical permanent total. And a medical permanent, and those factors were taken into account. The Baldwin case that I also cited, again, a medical permanent total, but again, the court looked at those factors. They feel that those factors are relevant. The question is, when you take all those factors together, is it clear that this person can't do anything, really can't be employable? It's then, if it's not, if the condition is such that the person can do something, can do some work, can lift ten pounds, can work with a sit-and-stand option, then we look into the odd lot situation. So the cases that I cited in my brief, there's a number of them. One, there are a number of cases just based upon a treating physician, or excuse me, examining physician's statement that the person is permanently and totally disabled. But there are also cases that say you have to take these factors into account. You can't just, you know, look at just the medical aspect of it. You have to look at, sure, a 30-year-old individual is going to be different than someone who's 60 years old. From what standpoint? Medical or odd lot? Medical. Because the doctor's got to know a person. When they treat the person, they say, you know, when they write that restriction. It's very easy for a doctor to turn around and say, if you go back to work, you're endangering your life or health. I don't think that's not the standard. Well, that's what the Supreme Court said in the E.R. Moore. That's exactly what they said. But it's also the fact, is there really a labor market available for this individual? The employee is not entitled to permanent total disability if he's qualified for and capable of obtaining gainful employment without serious risk to his health or life. He is not a permanent total. Now, he's not a medical permanent total. He could be an odd lot. Now, you know, you can't, you know, run with the hounds and hide with the fox. Sure. Either he's medical or he's odd lot. Right. Which is he? It's medical. Medical. It's medical. Now show me the testimony that suggests that he cannot work without endangering his health or life. Just tell me who gave that testimony. There is no one that gave that testimony specifically. But Dr. Koh gave his opinion that based upon his experience as a treating physician, that the person, one, was not employable, and two, if he was, he couldn't even work a 40-hour work week. But these weren't the only factors that the arbitrator and the commission looked at. They did look at the fact that the company did put the man on a permanent disability pension. And the reason we feel that is relevant is, you know, Now, I'll give you one for your sake. Okay. Was there ever a motion to strike Koh's testimony as being outside his area of expertise? No. Okay. No. And just going into the fact that the company put him on a permanent total disability pension in 1998, they had their human resources man, Dave Taylor, came in and testified about that pension. And the fact that two in their letters in the file that were directed, excuse me, in the record, directed to the claimant that said, hey, you are permanently and totally disabled. You're not partially disabled. You're not, you know, sort of disabled. You are permanently and totally disabled, and therefore you're going to get 900 and some odd dollars a month for the rest of your life. They had Mr. Taylor on the stand. If it wasn't because of his condition, because of his neck condition, they could have had Mr. Taylor explain, oh, this is just because we don't have work in this department for him. We're going to give him this pension for the rest of his life. So he was there. He was available. He could have explained what standards, if the plain language of the letter, that he's permanently and totally disabled, if that's not accurate, they could have explained how that individual would receive that pension. The other fact is the company is asking for a credit. They want to take $900 a month off of this man's permanent total disability benefit because he is permanently and totally disabled. And if this pension wasn't related to his condition, they couldn't get that credit. It wouldn't be allowed. And he didn't get this pension, he didn't get it when he had his back problem. He didn't get it when he had any other of his medical problems. He got it at the time he was treating for his neck. When the doctors were seeing him on a regular basis for his neck, that's when he applied for the pension, that's when they gave it to him. So I think it's somewhat anomalous that logically they're going to say he's not totally disabled or it's not related, yet they want credit against the money that they have to pay under the permanent disability award for that pension. So, again, I think the questions are here. And, again, I would cite those cases that I outlined in my brief about permanent total, about the difference between on lot, that the facts are here for the commission and for this Court that would support a finding that a rational prior fact would find that there was a causal relationship and that the man is permanently and totally disabled. Thank you. MR. COLEMAN. Rebuttal, please. MR. KLEINER. Did you ever move to strike Coe's testimony? MR. COLEMAN. Excuse me? MR. KLEINER. Did you ever move to strike Coe's testimony? MR. COLEMAN. No, we did not. MR. KLEINER. Outside of his area of expertise, incompetent? MR. COLEMAN. No. But that does not convert it from being just general testimony into something that would actually be sufficient to support the commission's decision. By the way, Dr. Coe's opinions, I can cite specifically to the page numbers in his deposition. The unable to carry out gainful employment in any type of competitive labor marketplace at page 31 and 32 of his deposition, which I believe corresponds to C1052-53. On page 56 of his deposition, which I believe would correspond to C1076, where he says that's because of his inability to work 40 hours. And then page 57, which I believe would be C1077, again, it's based solely on the petitioner's complaints. With regard to the causal connection questions, yes, an MRI was ordered after this occurrence. Why? MR. KLEINER. Can I ask you a question? What's wrong with a doctor rendering an opinion based upon his patient's complaints? Is there something incompetent about that? MR. COLEMAN. No. No. It's not objective, but it's certainly something that can be taken into account. But when you factor in the fact that the petitioner is not really a credible source of information, then it diminishes the impact of that opinion. And in any event, to the extent all he said was he couldn't work 40 hours a week, he never identified how many hours he could work, how regularly, whatever, all of this goes to the factors that a vocational specialist should be taking into account to determine whether or not this guy really was a vocational specialist. MR. KLEINER. Which was your argument, that he's rendered a vocational opinion and not a medical opinion? MR. COLEMAN.  MR. KLEINER. And then he's not. MR. COLEMAN. Well, I mean, it's kind of a hybrid opinion. I mean, he validates the guy's complaints, but then he takes a further step, saying those complaints do not translate into somebody who would be employable. That's where he crosses. MR. KLEINER. Well, moving back to my other question, did he ever testify that work would endanger this man's health or life? Did he ever say that? MR. COLEMAN. I'm assuming he knew what the work was.  MR. KLEINER. Did he ever testify? That was my question. MR. COLEMAN. No, he did not testify to that. MR. KLEINER. Oh. MR. COLEMAN. Nowhere. Nowhere did he testify. Getting back to the cause of connection questions, they did order an MRI after this gentleman's accident. They did that in late October 1994. They did that to obtain a differential diagnosis, even by Dr. Coe's testimony. However, that MRI never revealed any pathology that would be a competent cause for ulnar problems in the gentleman's left arm. So the MRI is kind of a red herring. Counsel said that the petitioner did very heavy work before this accident. He did not. He was under restrictions. In fact, one of the restrictions was actually no overhead work. And why? Because, among other things, he had chronic neck pain and headaches since 1979. Counsel said that his client filled out a company disability application or report that included complaints of neck pain. He sure did. On November 2, 1994. When was that? That was the day after his wife threw him up against the wall when he was taken to the hospital on a stretcher wearing a cervical collar where they did cervical x-rays, where his right arm pain began. What does it mean to say that a person has decreased sensation in the distribution of the left ulnar nerve? I'm sorry? What does it mean to say that an individual has decreased sensation in the distribution of the left ulnar nerve consistent with left ulnar nerve entrapped in neuropathy? My interpretation of that is your ulnar nerve in the funny bone is the ulnar nerve. Something's wrong with your left ulnar nerve. Correct. Okay. Cole gave that opinion. Yeah. It was Cole's opinion. You don't have a problem with that. He can give that opinion. Absolutely. Okay. Thank you, Counsel. Thank you. Clerk, we'll take the matter under advisory for disposition.